[No. F007103. Fifth Dist. May 13, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT B. WHITE et al., Defendants and Appellants.

[Opinion certified for partial publication.*]

*Parts II through VII are not ordered published, as they do not meet the standards for publication contained in rule 976(b) of the California Rules of Court.

**COUNSEL**

Glenn M. Kottcamp and Jeff Reich, under appointments by the Court of Appeal, and Robert E. Birchfield for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Roger E. Venturi and Eddie T. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WOOLPERT, Acting P. J.**—Defendants Arvilla White and Robert White were first charged in November 1984 with multiple violations of the Health and Safety Code: count one, violation of section 11378 (possession of methamphetamine for sale); count two, section 11358 (unlawful cultivation of marijuana); and count three, section 11359 (possession of marijuana for sale). A third defendant, Victor Buckner, was also charged in the same information with two counts of violating the Health and Safety Code.

At their arraignment, all three defendants were represented by the same attorney, Mr. Daniels. Daniels had represented Arvilla White and Robert White at their preliminary hearing. Arvilla White indicated at the arraignment she would retain Thomas Daly as her attorney. Daly was in fact confirmed as retained counsel for her on December 7, 1984.

On February 8, 1985, the district attorney filed a motion requesting the court appoint independent counsel for defendants Robert White and Victor Buckner. The motion was withdrawn after Buckner's case was severed.

On February 21, 1985, Attorney Daniels filed a motion to suppress evidence pursuant to Penal Code section 1538.5. The motion challenged the validity of the warrant and the entry by police. Shortly thereafter, Daniels also moved to withdraw as attorney. On February 28, 1985, the motion to withdraw and the motion to suppress evidence were both denied.

Defendant Robert White filed a motion for disclosure of the identity of the confidential informant. On March 20, Arvilla White and Robert White both appeared before the court and entered conditional guilty pleas to certain counts. They were represented by separate counsel when these pleas were entered. Both defendants moved to withdraw their pleas, one on April 30 and the other on May 1. The motions were granted.

Attorney Daniels, who was representing Robert White, again moved to withdraw as counsel. His motion was granted. Attorney Daly then represented both Robert White and Arvilla White. The minutes indicate both defendants were advised of a possible conflict in joint representation, but waived it.

New felony charges were filed against Arvilla and Robert White in late May of 1985. The defendants were jointly represented at their preliminary hearing by Attorney Daly. Each were advised as to the possible conflict in joint representation, and each expressly waived the conflict.

An information was subsequently filed in case No. 29440 in June of 1985. Robert White was charged with violation of Health and Safety Code section 11378 (possession for sale of methamphetamine) in count one, and violation of Health and Safety Code section 11377 (possession of methamphetamine) in count two. In count three, Arvilla White was charged with violation of Health and Safety Code section 11377 (possession of methamphetamine). In count four, defendants Robert White and Arvilla White were jointly charged with violation of Penal Code section 182, subdivision 1,[1] and Health and Safety Code section 11378 (conspiracy to possess a controlled substance). Similarly, in count five, they were jointly charged with violating section 182, subdivision 5 (conspiracy to obstruct justice). All counts in this information included an allegation pursuant to section 12022.1 (the offense was committed while defendant was released from custody on bail or on his/her own recognizance pending trial on the earlier offense.

The fourth count included three overt acts: (1) on February 14, 1985, Arvilla White attempted to destroy or conceal methamphetamine in a toilet when officers arrived to serve a search warrant at her residence; (2) on the same date, Robert White and Arvilla White possessed weights for a scale and narcotics packaging material in a bedroom next to the bathroom where Arvilla White was attempting to destroy or conceal evidence; (3) also on February 14, a vial of methamphetamine was found on the person of Robert White.

As to the fifth count, two overt acts were alleged: on February 14, 1985, Arvilla White attempted to destroy or conceal evidence of narcotics possession by placing methamphetamine in a toilet when officers arrived to serve a search warrant at her residence; (2) on this same date, Robert White willfully resisted, delayed or obstructed a police officer who was attempting to perform his duties during the service of the search warrant at the White residence.

The prosecution's motion to consolidate case numbers 28353 and 29440 for trial was granted. A jury trial followed. Defendants were again advised of their right to separate counsel, and of the existence of a potential conflict. Again they waived their rights. Defendant's motion for discovery of the confidential informant was denied. The prosecution's motion to amend the

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

information in case No. 28353 to dismiss defendant Arvilla White from count one, and to add a new count six against her alleging a violation of Health and Safety Code section 11377 (possession of methamphetamine) was granted. Arvilla White subsequently pled not guilty to this new count. The court next granted the prosecution's motion to dismiss counts one and six of the amended information in case No. 28353. The court additionally granted the prosecution's motion that no mention be made of the prosecution's loss of methamphetamine.

A second amended information was filed in case No. 28353. The second amended information basically renumbered the remaining felony counts so that count one charged violation of Health and Safety Code section 11358 (unlawful cultivation of marijuana); and count two charged violation of Health and Safety Code section 11359 (possession of marijuana for sale).

The jury returned the following guilty verdicts against Robert White: In case No. 28353: count one, violation of Health and Safety Code section 11378 (possession of methamphetamine for sale); count two, violation of Health and Safety Code section 11358 (cultivation of marijuana); count three, violation of Health and Safety Code section 11357, subdivision (c) (the lesser included offense of misdemeanor possession of marijuana). In case No. 29440, the jury found Robert White guilty of the following: count one, violation of Health and Safety Code section 11378 (possession of methamphetamine for sale); count two, violation of Health and Safety Code section 11377 (possession of methamphetamine); count four, violation of section 182, subdivision 1, and Health and Safety Code section 11378 (conspiracy to possess methamphetamine for purposes of sale); count five, violation of Penal Code section 182 and subdivision 5 (conspiracy to pervert or obstruct justice). In count four, overt acts one, two and three were found to be true. In count five, overt acts one and two were found to be true. As to all counts, the section 12022.1 allegation was found to be true.

The jury found Arvilla White guilty as follows: In case No. 28353: count two, Health and Safety Code section 11358 (cultivation of marijuana); count three, Health and Safety Code section 11357 (the lesser included offense of misdemeanor possession of marijuana); count six, Health and Safety Code section 11377 (possession of methamphetamine). In case No. 29440, defendant Arvilla White was found guilty as follows: count three, Health and Safety Code section 11377 (possession of methamphetamine); count four, section 182, subdivision 1, and Health and Safety Code section 11378 (conspiracy to possess methamphetamine for purpose of sale); count five, section 182, subdivision 5 (conspiracy to pervert or obstruct justice). All the overt acts alleged in counts four and five of case No. 29440 were found to be true, as were the section 12022.1 allegations.

Apparently the case was submitted to the jury with verdict forms based on the first amended information. After the jury was dismissed, the court struck the verdicts on count one as to Robert White and count six as to Arvilla White in case No. 28353.

In April 1986, Arvilla White was sentenced to three years felony probation for conviction of count three in case No. 29440 (possession of methamphetamine). Sentencing on all other counts was stayed pursuant to section 654. Defendant Robert White was sentenced to a total of five years: the three-year upper term for violation of Health and Safety Code section 11378 (possession of methamphetamine) in count one of case No. 29440; plus a two-year enhancement for the section 12022.1 allegation found to be true in that count (commission of the felony while on bail, etc., for a previous felony). The sentences on the other counts were stayed or run concurrently.

Both defendants appeal.

## FACTS

*Case No. 28353:*

A search warrant was executed at defendant's residence on August 1, 1984, by officers of the Kern County Sheriff's Department. The officers searched the house, a workshop, and the yard. In one of the bedrooms of the house, which was apparently the one used by defendants Robert and Arvilla White (rather than their former codefendant Buckner), the officers found over $1,000 in currency, scales, a book entitled the Cannabis Alchemy, a container of plastic bindles, hypodermic syringes, vials containing bindles, metal trays containing various objects (small scissors, surgical forceps, plastic bindles), photographs of what might be marijuana plants, and four rolled baggies containing marijuana. Also in the bedroom, on a shelf, the officers discovered a .22-caliber revolver, and documents indicating quantities of substances with values attached and the names of individuals who had paid for these quantities. In the garage, the officers found another baggie of marijuana on a workshop-type table.

In the back yard officers found twelve marijuana plants growing in two different locations. The plants ranged from sixteen inches to three to four feet tall. The plants appeared to have been tended because there were no weeds or grass around the base of the plants and the ground around them appeared to have been recently watered.

Apparently officers also found 1.74 grams of a white powder containing methamphetamine, and a glass vial containing 0.002 grams of another white

powder which contained amphetamine. This contraband formed the basis for counts one and six of the amended information which charged Robert White with possession of methamphetamine for sale (Health & Saf. Code, § 11378), and defendant Arvilla White with possession of amphetamine (Health & Saf. Code, § 11377). These counts were later dropped from the second amended information. However, as previously noted, the verdict forms submitted to the jury were based upon the first amended information. As a result, the court struck the verdicts on count one as to Robert White and count six as to Arvilla White. The prosecution had learned the methamphetamine was lost and successfully moved to dismiss counts one and six and to not have the lost methamphetamine mentioned.

Former codefendant Buckner testified at trial that the 12 marijuana plants growing in the back yard were his, and that he was the party cultivating them.

*Case No. 29440:*

Sheriff's deputies from the Kern County Sheriff's Department executed a second search warrant at defendant's residence on April 14, 1985. Deputy Lavelle saw someone run past a window after the officers knocked at the door and announced their purpose. A second deputy, Watkins, thereupon entered the residence and went directly to the bedroom where the contraband was found during the previous search. Deputy Lavelle found defendant Arvilla White in the adjacent bathroom. Her five-year-old daughter was with her. Arvilla White was sitting on the toilet when the officer found her. He ordered her off and as she did so, she closed the seat to the toilet. Inside the toilet he found a bag containing a white powdery substance. He called for assistance and the baggies were seized by Deputy Watkins. The bag retrieved by Deputy Watkins was found to contain five smaller bags.

The bags found in the toilet were determined to contain 7.3 grams of a white powdery substance containing methamphetamine. Deputy Watkins testified that in his opinion, the methamphetamine was possessed for sale. His conclusion was based upon the number of baggies found and the manner in which the substance was packaged, as well as the quantity found. He did acknowledge, however, that it was possible such a quantity was for personal use.

Also present during the search was Deputy Bradley. Bradley saw Defendant Robert White standing between the bedroom where Deputy Lavelle had gone, and the living room. Bradley attempted to prevent defendant from moving around the residence. Bradley testified he had heard rumors that Robert White had made threats against police officers in the past.

When Bradley attempted to restrict Robert White's movements, Robert White became irate and objected to the officers' presence in his home. Robert White became verbally abusive and would not follow directions. Bradley attempted to handcuff him, and after one handcuff was put on, Robert White pulled away and turned toward Bradley. Bradley forced him to the ground and finished handcuffing him. There was other testimony, however, that Robert White offered no resistance and that Bradley forcibly subdued him.

A pat-down search of Robert White was subsequently performed by Deputy Yoon. In the bottom seam of Robert White's T-shirt, Deputy Yoon found a small amber vial containing a white powdery substance. It was later determined the vial contained 0.61 grams of white powder containing methamphetamine.

The officers again searched the defendants' bedroom. Scale weights were found, as well as a large plastic bag which contained smaller baggies. Different colored vials were found in another bedroom.

As previously noted, the methamphetamine found in the baggies in the toilet totaled 7.3 grams. The different baggies contained various amounts.

Certified court documents admitted into evidence at trial established both defendants were on bail at the time of the offense(s) charged in case No. 29440.

According to testimony at trial, police searched nearby houses on August 1, 1984 (the date of the first search), and made trips back and forth between the houses. Two of defendants' children testified Robert White offered no resistance to Deputy Bradley, and did not argue with him. Their former codefendant, Victor Buckner, testified he lived at the house when the searches took place. He testified he grew and cultivated the marijuana for his own use; however, he denied the scales or marijuana book found in the bedroom belonged to him.

Defendant Arvilla White testified she never used marijuana and did not grow it. Nevertheless, she admitted being aware marijuana plants were being grown on her property. She also admitted knowing other family members used marijuana at her home, and that marijuana was present in the garage during August of 1984.

She explained the photographs by testifying that they belonged to a friend of her husband. The book about marijuana had been in the house for three or four years. The cash found in the bedroom was being stored there prior

to being taken to the bank. The large amount was explained by the fact her husband had recently been paid and she had cashed another check for a smaller amount. The scales found in her bedroom were used to store knick-nacks.

She denied there were any baggies of marijuana on her dresser during the August 1, 1984, search. Nevertheless, she admitted there may have been loose marijuana leaves on a wooden tray on the dresser, but only enough to make a few marijuana cigarettes. This marijuana probably belonged to her husband.

During the February 14, 1985, search, she was using the bathroom when the officers entered. She stated she never saw plastic bags in the toilet bowl, and that the officer did not enter the bathroom. After she was removed from the bathroom and taken to the living room, an officer came out of the bathroom with a baggie and claimed he found it in the toilet.

She testified she used plastic bags for holding jewelry for yard sales, and that the vials were used to hold glitter and beads. Other items were explained on this same basis. The presence of the substance Mannitol was explained as a material used for cooking vegetables. She denied that the handwriting on "pay and owe" sheets was hers. She also testified she did not recognize these sheets. She denied possession of methamphetamine for sale and claimed she never saw any methamphetamine on the premises. She further denied attempting to destroy contraband and denied knowing her husband possessed any at the time of the second search.

The testimony regarding Mannitol was rebutted by testimony from Deputy Fivecoat. The Mannitol was found in the bedroom on August 1, 1984. Deputy Fivecoat testified that Mannitol was a cutting agent for controlled substances. He testified that under a mattress in the bedroom, they found a substance which was later analyzed and found to contain methamphetamine. However, it was later stipulated that no analysis in fact took place by the criminalist testifying at trial.

DISCUSSION

I. ADVICE REGARDING SEPARATE COUNSEL

 Both defendants argue reversal is required because when being advised of the problems which might result from joint representation, the court failed to also inform them that if they thought a second attorney was necessary, an attorney would be provided at no cost if the defendants could not afford a second attorney. Reversal is necessary, the argument goes,

because the waivers were not made knowingly and intelligently. Defendants rely upon *People* v. *Mroczko* (1983) 35 Cal.3d 86 [197 Cal.Rptr. 52, 672 P.2d 835], and *People* v. *Sanford* (1985) 174 Cal.App.3d 11 [219 Cal.Rptr. 726], for the proposition that a *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] type of knowing, intelligent and voluntary waiver on the question of separate appointed counsel is required.

Defense counsel Daly informed the court of the *potential* conflict of interest. In *Sanford,* the defendant argued on appeal the trial court erred in allowing a single attorney to represent both he and his wife. (*Id.* at p. 16.) The basis of his argument was "that the waiver is insufficient because he was not informed that, if indigent, separate counsel would be appointed at government expense." (*Ibid.*) The court preceded its discussion by stating its ruling on this issue: "The . . . argument fails because no such admonition was required and for absence of a showing of prejudice." (*Ibid.*) Defendants' reliance on *Sanford* seems curious given this conclusion by the court. The Attorney General distinguishes *Sanford* and argues against its analysis. As a result, further discussion on this issue is necessary.

As in the present case, the defense attorney in *Sanford* raised the issue of a *possible* conflict. The *Sanford* court noted that because of this, the inquiry set forth in *People* v. *Cook* (1975) 13 Cal.3d 663, 671-672, and footnote 7 [119 Cal.Rptr. 500, 532 P.2d 148], was inapplicable. (*People* v. *Sanford, supra,* 174 Cal.App.3d at p. 17.) ■ The *Cook* requirements were described by the *Sanford* court as follows: "*Cook* recommends that when confronted with a jointly retained counsel the court should (1) inquire whether defendants and their counsel have considered the possibly damaging effect of a potential conflict, and (2) admonish the defendants that if a conflict exists each might better be represented by separate counsel. (*Id.,* at p. 672, fn. 7.)" (*Sanford, supra,* at p. 17, fn. omitted.)

The *Sanford* court correctly goes on to state that under *Maxwell* v. *Superior Court* (1982) 30 Cal.3d 606 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333]: "When the issue is raised by defense counsel or a defendant the court must obtain a knowing and intelligent waiver on the record of defendants' constitutional rights to effective assistance of counsel. (See *id.,* at pp. 619-622.)" (*Sanford, supra,* 174 Cal.App.3d at p. 17; see also *Maxwell* v. *Superior Court, supra,* 30 Cal.3d at p. 620, fn. 12.)

■ As noted, the court in the present case obtained a waiver from both defendants. However, the court did not advise of the availability of appointed counsel if separate representation would place defendants, or either of them, in an indigent status.

No specific guidelines for establishing that a waiver is knowing and intelligent were offered by the court in *Maxwell*. (Accord, *People* v. *Sanford, supra,* 174 Cal.App.3d at p. 17.) *Maxwell* was more concerned with the sufficiency of the waiver in terms of warning the defendant of the dangers of proceeding with a single attorney. (*Maxwell* v. *Superior Court, supra,* 30 Cal.3d at p. 621.)

■ However, the court did state: "With recent guidance from the United States Supreme Court we now reaffirm that judges need not inquire about conflicts affecting retained counsel unless, as here, the issue is raised by counsel or a party. Counsel has the responsibility to advise both client and court of potential conflicts as soon as they arise. Where this duty is breached and trial proceeds without disclosure and formal waiver, defendant may of course argue that a conflict of interest did adversely affect counsel's efforts in his behalf." (*Maxwell* v. *Superior Court, supra,* 30 Cal.3d at p. 620, fn. 12.)

*Sanford* goes on to point out that more specific guidelines for a. waiver were discussed in *People* v. *Mroczko, supra,* 35 Cal.3d 86.

The *Mroczko* court stated: "No particular form of inquiry is required, but, at a minimum, the trial court must assure itself that (1) the defendant has discussed the potential drawbacks of joint representation with his attorney, or if he wishes, outside counsel, (2) that he has been made aware of the dangers and possible consequences of joint representation in his case, (3) that he knows of his right to conflict-free representation, and (4) that he voluntarily wishes to waive that right." (*Id.* at p. 110.)

The above quote from the *Mroczko* opinion is nothing more than the second prong of what is now a two-prong approach in cases involving *court-appointed* counsel where the court allows appointed counsel to continue to represent codefendants. The first prong is a new, judicially created rule— initial appointment of *separate* counsel who independently discusses the problems of joint representation. The second prong occurs *after* the separate court-appointed counsel has fully advised defendants. (*Id.* at p. 116.) The above-quoted inquiry is made in order to fulfill the second prong of the *Mroczko* rule.

The *Mroczko* opinion does not set a blanket rule for all cases. ■ The court elaborated upon the instances of joint representation by retained counsel where an inquiry such as the one in the second prong of the *Mroczko* rule is necessary: "When a trial court 'knows or reasonably should know that a particular conflict exists,' it must inquire of defendants to obtain a valid waiver. (*Cuyler* v. *Sullivan, supra,* 446 U.S. at p. 347 [64

L.Ed.2d at p. 346].)" (*People* v. *Mroczko, supra,* 35 Cal.3d at p. 111, fn. omitted.)

We would be surprised if the rule were to the effect that a judge put on notice of a conflict would have no duty to investigate that conflict simply because counsel had been privately employed.

*Mroczko* assures that when the *court* is responsible for obtaining counsel for multiple defendants it must go through a procedure which assures no actual or potential conflict exists, or at least a valid waiver is made, if the defendants wish to have single representation. This protective rule is appropriate inasmuch as the defendants are not selecting counsel of choice, and often are not happy with appointed counsel. However, when defendants choose private counsel, their personal reasons for the choice may not be apparent, and may not, for example, be challenged by the court to the point of revealing confidences. Therefore, when defendants appear with private counsel they do so with some deference to be given their choice.

█ This view is in line with the long-standing position taken by the Supreme Court to avoid interference, whenever possible, with the relationship between a defendant and retained counsel: "On the other hand, when multiple defendants freely and voluntarily retain joint counsel the court is not required to assume a similar burden. Indeed, it is extremely doubtful that defendants right to retain counsel of their own choice could or should be challenged by the trial court. (See *United States* v. *Paz-Sierra* (2d Cir. 1966) 367 F.2d 930, 932.)

"In *People* v. *Chacon, supra,* 69 Cal.2d 765 we granted relief and refused to engage in ' "nice calculations as to the amount of prejudice" ' arising from the denial of the assistance of counsel where the *court* had the burden of ascertaining a conflict of interest confronting a jointly appointed counsel. (*Id.,* at pp. 775-777.) However, we recognized there that a showing of prejudice was nevertheless essential to a grant of relief. (*Id.,* at p. 776, fn. 3.) Unlike the situation in *Chacon* the failure in the instant case to have each defendant represented by separate counsel cannot be attributed to any default on the part of the court. The question whether defendants should have had separate counsel was one which was properly addressed to and considered by, or should have been considered by, defendants and jointly retained counsel. If counsel failed to bring such matters to the attention of defendants, or if he failed thereafter to properly advise them after he made them aware of the possibilities of a conflict, such default was attributable solely to counsel." (*People* v. *Cook, supra,* 13 Cal.3d at pp. 671-672, fn. omitted.)

*Mroczko* does not signal a shift in the high court's attitude toward cases where counsel is retained. Indeed, the court, on several occasions, reiterated

it was dealing with a situation where joint counsel was appointed and indigents were involved. (See *People* v. *Mroczko, supra,* 35 Cal.3d at pp. 109, 115, 116 & fn. 33.) Nevertheless, *Mroczko* reaffirms the duty of the court to inquire where conflicts become, or should have become, apparent.

The *Sanford* opinion expands on *Mroczko* when it makes the following statement: "These guidelines[2] are bottomed on federal cases. (*Ibid.*) One of them, *United States* v. *Foster* (1st Cir. 1972) 469 F.2d 1, advances, as a judicial rule, that a court should inquire, inter alia, 'whether [defendants] understand that they may retain separate counsel, or if qualified, may have such counsel appointed by the court and paid for by the government.' (*Id.* at p. 5.) *Foster*'s gloss on the admonition has been incorporated into the Federal Rules of Criminal Procedure. It is cited with apparent approval in the Notes of Advisory Committee on Rules to the Federal Rules of Criminal Procedure, rule 44 (18 U.S.C.). Following this authority as suggested in *Mroczko, a trial court should include in a conflict admonishment the information that, if defendants are unable to afford to retain more than one attorney, separate counsel will be appointed by the court and paid for by the government.* With this as background we turn to defendant Bill Sanford's arguments." (*People* v. *Sanford, supra,* 174 Cal.App.3d at pp. 17-18, italics added.)

As the above quotation demonstrates, the *Sanford* court seems to create an apparent contradiction with its opening paragraph on the discussion of this issue because it now states that such an "admonition" is required under *Mroczko*. (Compare *Sanford, supra,* at p. 16, with p. 18.)[3] The contradiction

---

[2] The "guidelines" referred to by the *Sanford* court have been discussed earlier (*ante,* p. 1340).

[3] Further, to the extent the court states that such an admonition is necessary, it does so purely as a matter of dictum since it was unnecessary to reach the issue for a number of reasons. First, according to its own holding, even if such an admonition was necessary, no prejudice was shown due to the lack of the admonition (presuming for purposes of argument only that one was necessary). (See *Hart* v. *Burnett* (1860) 15 Cal.530, 598; *People* v. *Gregg* (1970) 5 Cal.App.3d 502, 506 [85 Cal.Rptr. 273].)

Second, although the *Mroczko* court cited with apparent approval the *Foster* opinion upon which the *Sanford* court relies, the reference is ambiguous, at best, as to the exact proposition for which *Foster* was cited. It is part of a "string" citation which follows the "guidelines" quotation from *Mroczko* contained in *Sanford*. It is noted that in that quotation, the court simply states no particular form of inquiry is required, and then states the *minimum* things about which the trial court must assure itself prior to allowing joint representation to continue. One of the *possible* things about which the court is *not* told, at a minimum, to assure itself of by the *Mroczko* court is whether separate representation will create a financial burden for the defendant. Similarly, the *Mroczko* "list" says nothing about a duty to admonish the defendant that separate counsel will be provided at no cost, if necessary. (See *People* v. *Mroczko, supra,* 35 Cal.3d at p. 110.)

Finally, the *Mroczko* court was concerned with problems involving *appointed* counsel, not retained counsel. Even if we assume that somehow separate counsel might at some time create a financial hardship, it is no small leap to land where the *Sanford* court did by conclud-

is later clarified in the opinion when the court reasons that such an admonition was not required at the defendant's pre-*Mroczko* trial.

In *Foster,* the First Circuit Court of Appeals promulgated a rule requiring district courts in criminal cases to comment on some of the risks of joint representation if multiple defendants are represented by a single attorney. (*United States* v. *Foster* (1st Cir. 1972) 469 F.2d 1, 5.) The court must assure itself the defendants are aware of such risks, and it must inquire as to whether the defendants have discussed the risk with their attorney. Finally, the court must assure itself that the defendants understand separate counsel may be retained by them, or if they are qualified, separate counsel will be appointed by the court and paid for by the government.

Where a satisfactory inquiry does not appear on the record, the burden of persuasion shifts to the government to show from the record that prejudice was improbable. The court expressly rejected following the approach of other appellate courts which have adopted a rule of automatic reversal. (*Ibid.*)

*Foster* is cited for this proposition in the Notes of the Advisory Committee on Rules for Federal Rule of Criminal Procedure, rule 44(c). However, the rule itself does not expressly require such an admonition: "Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel."

*Foster* has not gone uncriticized, although no case has challenged it on this precise basis. For example, not all federal courts of appeal agree with *Foster* on the shifting of the burden of proof to the government. Similarly, courts have disagreed with *Foster* as to when the trial court's duty to inquire arises. (See, e.g., *United States* v. *Lawriw* (8th Cir. 1977) 568 F.2d 98, 103; *United States* v. *Mandell* (7th Cir. 1975) 525 F.2d 671, 677.) Nevertheless, *Foster* is frequently cited for its requirement of a duty to inquire. These same courts (citing *Foster*) often cite it merely for the proposition that a

---

ing that admonishments not even mentioned in the *Mroczko* opinion should apply where the court is initially faced with joint representation by retained counsel and *only a possibility* of a conflict. Further, in *Sanford* as in the present case, no financial need was brought to the court's attention by the defendants.

knowing and intelligent waiver of the right to independent counsel is something about which the court must inform the defendant. Reference to the *Foster* court's discussion of knowing and intelligent, as including advice counsel may be provided at no cost, is not mentioned.

In fact, even the United States Supreme Court has recognized that since its opinion in *Glaser* v. *United States* (1942) 315 U.S. 60 [86 L.Ed. 680, 62 S.Ct. 457], "courts have differed with respect to the scope and nature of the affirmative duty of the trial judge to assure that criminal defendants are not deprived of their right to the effective assistance of counsel by joint representation of conflicting interests. Compare *United States* v. *Lawriw,* 568 F.2d 98 (CA8 1977); *United States* v. *Carrigan,* 543 F.2d 1053 (CA2 1976); and *United States* v. *Foster,* 469 F.2d 1 (CA1 1972), with *Foxworth* v. *Wainwright,* 516 F.2d 1072 (CA5 1975), and *United States* v. *Williams,* 429 F.2d 158 (CA8 1970)." (*Holloway* v. *Arkansas* (1978) 435 U.S. 475, 483 [55 L.Ed.2d 426, 434, 98 S.Ct. 1173] fn. omitted; see also *Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 346 [64 L.Ed.2d 333, 100 S.Ct. 1708].)

The court in *Holloway* expressly declined to resolve the different approaches taken by appellate courts on this issue. (*Holloway* v. *Arkansas, supra,* 435 U.S. at p. 484 [55 L.Ed.2d at p. 434].)

 Under the circumstances of this case, we conclude the inquiries and admonitions given by the court were sufficient, especially in light of the fact no *actual* conflict was presented to the court or reasonably apparent at the time counsel was retained, and defendants had received numerous prior admonitions after discussing the issue with other private counsel. The court's ruling that defendants' waivers were made knowingly and intelligently was correct. (*United States* v. *Lawriw, supra,* 568 F.2d at p. 100.)

We are particularly impressed with the care given by the attorneys and courts in advising the defendants of the risks of joint representation. At one time there were conditional guilty pleas by both defendants while separately represented. Later, when they appeared with only a single attorney, and advice was given again, it was clear that the entire question of joint representation had been reviewed before the court appearance.

In February of 1986, Mr. Daly advised Judge Baca in chambers, off the record, of the need for a waiver, and then, on the record, the waiver was discussed at length. Defendant Robert White was clear on the subject, after separate advice: "I've talked with lawyers about it." When the court outlined the extent of the waiver, Mr. White intelligently limited it by asking to be assured "[j]ust on that one issue?"

Even if the court below erred according to the *Sanford* rule, the error has not been shown to have been prejudicial. Counsel below did not allege an actual conflict, and on appeal no actual conflict is pointed out to this court. It has not been shown separate counsel would have done anything different or more beneficial to either defendant. An informed speculation does not show the defendants' right to effective assistance of counsel was prejudicially affected through their representation by a single attorney. (*People* v. *Mroczko, supra,* 35 Cal.3d at p. 105.)

### II.-VII.*

. . . . . . . . . . . . . . . . . . . . .

The judgments are affirmed.

Ballantyne, J., and Brown (G. A.), J.,† concurred.

Appellants' petitions for review by the Supreme Court were denied August 10, 1988.

---

\* See footnote, *ante,* page 1329.

† Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.